We'll start with 23-3264. We'll show all these Smith and related cases. Mr. Carswell. May it please the court, I'm Dwight Carswell, appearing on behalf of Appellant Colonel Eric Smith. The district court should be reversed for three reasons. First, plaintiffs lack standing to obtain prospective relief. Second, plaintiffs failed to show the sort of extraordinary circumstances that would justify an injunction with such profound federalism and separation of powers implications, particularly when adequate relief remains at law in the unlikely event of any future constitutional violation. Finally, the district court's two-step and consent search provisions of its injunction conflict with 10th Circuit and Supreme Court precedent. On standing, this case is indistinguishable from Lyon's. Plaintiffs' fears of a future constitutional violation are wholly speculative and rely on a chain of contingencies. First, plaintiffs would have to be stopped in the future by a Kansas Highway Patrol trooper for a traffic violation, which is speculative. Can you slow down just a little? Oh, sure. And then on top of that, the trooper would have to determine to further detain one of the plaintiffs based on the trooper's determination that reasonable suspicion exists under the totality of the circumstances, which is a very fact-bound inquiry and relies on lots of speculative facts that we don't know. And then in addition to that, the trooper would have to be wrong about the existence of reasonable suspicion, which is also speculative. Counsel, one thing that distinguishes this case on standing is that the district court made significant findings of fact about the prevalence of out-of-state drivers being stopped within the borders of Kansas, about the number of times those out-of-state drivers are subject to canine searches, to Kansas Highway Patrol's policy to stop as many drivers as it could. That was part of its policy and training. And then, of course, all this is wrapped up in Professor Momolo's expert findings and his data. And as I read the briefs, none of that is contested on appeal. Do I have that wrong? You do have the part about Momolo's testimony. We do, in fact, contest that. But regardless, even if, assuming that that's correct, that out-of-state drivers are disproportionately likely to be stopped, that's still speculative whether they will be stopped or not. And plus, that's only the first step in this chain of causation. In addition to the initial stop, then there has to be the decision to detain them based on the existence of reasonable suspicion, which is based on a bunch of different facts in any particular case that, again, there's just no way to know what an individual trooper in any case will decide to do. And then, in addition to that, the trooper has to be wrong about the existence of reasonable suspicion. And the only facts we have here are three to five individual cases of actual constitutional violations. That's over three years. Over five, over five years. Yeah, and we think it's really about three. Is one a year? About one a year, and out of what the district court said in footnote 11, it's about one to 200,000 KHP traffic stops per year. So one out of one to 200,000 stops. That's all the district court identified. And that goes to the second point in particular about whether injunctive relief is justified. We don't believe it is. Can we stay on standing for a second? Sure, sure. Help me also with this. During the pretrial litigation, the plaintiffs moved for class certification. In response, KHP offered stipulations, essentially saying class certification's unnecessary here. If the plaintiffs were to prevail, the relief that they are afforded would then be also afforded to all putative members of the class. So because KHP took that position before the district court, and then the district court relied upon it, and saying I'm not gonna certify the class, the plaintiffs were clear that if they did not want to accept those stipulations because they didn't want to be in a standing battle later, but yet here we are. So why should the Kansas Highway Patrol not be judicially a stop from making an argument contrary to what they made below that the district court relied upon? Well, three points. First of all, in part of that stipulation, KHP made clear that we still reserve the right to contest their standing. Secondly, even with class certification, you still have to show that the named plaintiffs in the class have standing. So it's not just other class members. You still have to show the named plaintiffs, which would be the plaintiffs here. So that actually doesn't change anything. And then finally, standing can't be waived. So even if KHP had decided to say we waive standing, that can't be stopped from raising standing because standing's jurisdictional. So for all those reasons. Let me ask you a couple questions about the distinction, if any, between this case and Lyons. Sure. Seems to me there are two things. One, in Lyons, the plaintiffs had to violate an unchallenged law, a serious criminal law, criminal offense. Here we're talking about traffic offenses, and lots of people violate traffic laws. That makes it much more likely. Second, here we have a policy of, as I understand the record, of the state police, the KHP, telling officers you can consider that the driver has come from out of state by looking at the license tag. And that can affect your regional suspicion calculation. Now, we're not talking about regional suspicion to stop. I think the only issue here is regional suspicion to prolong the stop. Yes. So in that circumstance, isn't there a significant enough likelihood that someone who commits a traffic violation, and we all do, unfortunately, will then be improperly detained after their purpose of the stop has been satisfied, and have their detention prolonged? Isn't there enough there to make that a sufficiently likely event to grant standing? So addressing your question is in order. First of all, Lyons itself dealt with a traffic stop, and the Supreme Court said the fact of that, the speculation of that happening again is part of what rendered the lack of standing there. So I don't think this case is distinguishable from Lyons on those grounds. To your second point, there is no KHP policy of detaining motorists without reasonable suspicion. So it wouldn't be violating. But if they calculate it wrong, if they encourage officers to use as a factor something that this court has repeatedly stated should not be considered as a factor, that's going to lead to unnecessary prolonged detentions, is it not? No, not necessarily. There were lots of times where officers say, I detained someone for 10 different factors for reasonable suspicions, and courts say, well, I find this innocuous, and I find this innocuous, but there's still reasonable suspicion. That's not just out of state. There are all kinds of factors that officers say, well, this contributed to reasonable suspicion when it actually didn't. So here, it's the consideration. But these plaintiffs, as I recall, at least four of the five or five of the six had been unreasonably detained. Isn't that correct? You're wrong, sorry. Yeah. In this case? We believe it's three, but three to five, somewhere in there. Three to five out of one to 200,000 stops per year, yes. And we don't believe that shows any sort of pattern of constitutional. Can you really say, I mean, these are the people who decide to come forward and sue. It's all- Can you really extrapolate that it's just three out of five of three or five out of several hundred thousand? That's all the plaintiffs have proven, I'll say that. So in order to obtain injunctive relief, or to even have standing, they need to prove more than that, is our view. And even if an officer considers some factor like traveling from out-of-state that ultimately is completely innocuous, that itself does not violate the Constitution or the Fourth Amendment. Ultimately, you gotta look at the, in fact, the district court here said there's been no stop where that's been the sole basis for stopping someone. It's always been in conjunction with other factors. But how do you square the Highway Patrol putting in a training manual as part of its policy that troopers should factor in out-of-state travel, origin, destination, things that this court in Vasquez in 2016, so predating all these stops, this court was pretty clear that those should not be part of the soup of reasonable suspicion. So how do we deal with that issue? Well, I don't know that it should. And the district court here actually said KHP's official policies appear to be consistent with Vasquez. The district court only found a problem based on practice. And that finding was based on two factors. First of all, Momolo's expert testimony and the traffic stops in this case. And we do, in fact, contest Momolo's expert testimony. First of all, the baseline that he used was based in calculating the percentage of out-of-state drivers on Kansas highways was based entirely on the Safegraph data from 2,000 some points of interest within a quarter mile of the highway, the interstate, and not based on who was actually on the interstate, the cell phones or otherwise. And so that's not gonna give an accurate representation of the percentage of out-of-state drivers to in-state drivers on the interstate. But even assuming, putting that aside, his disparity, the main disparity he identified had to do with the initial traffic stop, which even if a KHP trooper is disproportionately stopping out-of-state drivers for speeding, for instance, that doesn't violate the Fourth Amendment if they're actually speeding. And that's also not the issue in this case. This case is about detentions after the initial traffic stop. And there, his disparity was actually quite small. He said of all KHP traffic stops that he studied in his data set, about 77% were out-of-state drivers. And the detentions that he looked at, about 90% were. So there's only about a 13% disparity there, which could easily be explained based on fact-based considerations, given that reasonable suspicion is so tied up in the facts of any individual case. And then the issue in terms of the lack of evidence of how often this happens, what did the complaint allege? And don't we have to accept the allegations of the complaint absent factual data from the party challenging stand? No, no, we've had a trial now, so you no longer accept the complaint. We're way past that. That's, for standing purposes, they have to approve a trial that they have standing. So you no longer accept what's alleged in the complaint at this point. Well, the trial led to damage awards in several of these cases, is that correct? There were two trials for damage awards, which we aren't appealing those. Then there was a bench trial as to Colonel Smith and the injunctive relief, which also incorporated the evidence from the two, two jury trials. So there were three trials in all. So at the trial leading to injunctive relief, there was a stipulation that the judge could consider all the evidence in the other cases. That's correct, yes. I see I have about three minutes remaining if I could reserve the remainder of my time for rebuttal, unless there were further questions. Thank you. Good morning, your honors, and may it please the court, Kwan-Yi Ching for the Plaintiffs Appellees. This court's precedent in Vasquez v. Lewis was clear. Residency in a state with legalized marijuana and travel to or from such states is essentially meaningless in the reasonable suspicion calculus. Despite this court's directive that reliance on such factors is wholly improper, the undisputed testimony from KHP employees from top to bottom shows that the KHP deliberately ignored Vasquez for years. There was no change in policy or practice until appellees filed this lawsuit. Instead, the KHP continued with business as usual, training and permitting troopers to detain out-of-state motorists for canine sniffs based on state residency and travel plans, and the KHP will continue with that business as usual. And thus- Let me ask specifically. It's one thing to use the fact that someone came from a drug source or was headed toward a drug destination in the calculation of reasonable suspicion, but we have lots of cases where officers ask about travel plans. I think we specifically allow that during the detention. We can ask for driver's license and stuff, but they regularly ask about travel plans, and sometimes that is very probative for reasonable suspicion. When people start saying, well, you look at the rental car agreement, and it's three days, and why are you gonna travel to Chicago for three hours, et cetera? That's very probative. Is it clear that the training was just relating to whether it's a drug destination or drug source? Because there are certainly other reasons to ask questions when there's someone traveling interstate. Yes, Your Honor. Two parts to that, I think. One, I wanna clarify when we talk about travel plans. Primarily here, I am speaking of origin and destination, and of course, if travel plans as to how you're getting to a place or if stories between a driver or passenger about where they've been or where they're going are inconsistent, that is not what I'm speaking of. Well, that's not what you're speaking of, perhaps, but what is the training speaking of? Do they specifically say if the person is coming from a origin spot or a destination spot, that should be considered, or do they just talk about travel plans? Yes, Your Honor. Post-VASC has training materials continue to list source location and destination location as reasonable suspicion factors. There's no distinction for inconsistent travel plans, like I just mentioned. And the KHP continue to train troopers that the two most important questions they should be asking drivers are origin and destination. And none of the troopers who testified said that they do not rely on state of origin or destination as factors informing reasonable suspicion. And the district court found below that, sure, they mentioned other factors, but all of those factors were essentially so meaningless that it was clear that they were putting disproportionate weight on travel plans, destination, and origin. Counsel, can you help me? Sort of an issue that I'm a little bit stuck with, which is the injunction here dealt with these impermissible VASC as factors for reasonable suspicion analysis, but also, as I read it, has a prohibition on the Kansas two-step. And in the latter, that most commonly has arisen before our court in the criminal context. And at no point has this court said that that technique in and of itself violates the Fourth Amendment. So how can the district court now in the civil context enjoin the use of a technique that this court has on many occasions reviewed and never found to be unlawful? Yes, Your Honor. I think to say that the district court categorically enjoined use of the two-step is a mischaracterization of the injunction's terms. It does not read the KHP as enjoined from using the Kansas two-step period. It says the KHP is enjoined from using the two-step to extend traffic stops of motors without reasonable suspicion or without the motorist knowing intelligent and voluntary consent. And all of those cases that Appellant cites in his brief are individual criminal cases on motions to suppress. They never provided any court an opportunity to examine a broader, more pervasive practice. But if you have, oh, sorry, go ahead. Is there anything distinctive about these cases, use of the two-step, anything that distinguishes them from the cases in which we've upheld, what you call the two-step? Yes, Your Honor. It seemed like a routine two-step to me, but I might have missed something. So I think those suppression cases came at the two-step or challenged the use of the two-step in a variety of ways. But one factor that the district court found very compelling here and why the two-step was performed against out-of-state motorists in a coercive manner was proximity to the vehicle. And those cases don't address proximity to the vehicle. Could that be because it was irrelevant? No, as I was about to say, with one exception, Your Honor, that would be United States versus West. But that, I think the discussion of the proximity to the vehicle in that case, if you look at page 1175 of the opinion, it actually says that the trooper was standing back from the vehicle and therefore the defendant's argument that proximity to the vehicle was a reason why he felt coerced was not well supported. But counsel, going back to the scope of the injunction on the two-step, if the officer has reasonable suspicion, there would not be a need to execute the two-step. So I guess I'm just trying to figure out if you're giving guidance to the troopers and you say, well, you can't do the two-step unless you have reasonable suspicion. Again, that's the whole point of the two-step is to, at least in their view, to gather consent from the driver in the absence of reasonable suspicion. So what circumstances would there be for the trooper to ever have to execute the two-step now that this injunction's in place or if it were to go in place? Your Honor, the trooper never needs to execute the two-step. In many of those cases in which he cites, I think there's a very plausible argument to say that reasonable suspicion factors that would support a detention without performing the two-step were present. But the injunction is not unlimited as to the two-step either. There are very specific limits to the injunction. First of all, it's time limited. It's four years, and if the KHB is diligent, it could be as little as two years. And furthermore, the district court adopted Appellant's proposed limitation of the injunction scope, Appellant's scope, to individuals traveling in Kansas on I-70, I-35, U.S. 54, or U.S. 36, who were actually or appeared to be driving to or from Colorado in a vehicle with license plates from a state other than Kansas. Can you move the microphone over to your mouth a little bit? Is this better, Your Honor? You're looking down, and I'm not hearing you. Apologies, Your Honor. Yes, the district court adopted Appellant's proposed limitation. It does not apply to every car on the road. It doesn't apply to Kansas cars either. Since Your Honor spent most of the time inquiring about standing, I'd like to turn to that issue. First of all, this case is different from Lyons, as you noted, Your Honor, in a couple of very significant respects. First of all, Lyons did not involve an authorized practice. It did not involve targeting of a particular group for enforcement, and it certainly did not involve a law enforcement agency targeting that group in contravention of a prior court decision. As to the question of only having a few stops below, as the district court noted, fact-finding in this case was stymied to a large degree because of the KHP's significant documentation issue, and this is a... Because of what? I'm sorry. The KHP had significant documentation issues. It doesn't collect data on stops and reasonable suspicion factors. It could not provide that data to us during discovery, and it certainly could not identify any disparities or practices that required correction. And most of the injunction is directed at rectifying that data collection problem. Were you holding them at fault for not documenting anything? Not at fault. Well, I mean, if they don't know they've gotta do it, and now they're being told, well, you should have done it, and that's why I'm gonna grant the injunction, how does that work? Well, Your Honor, it's not you didn't collect the data, and that's why I'm gonna grant the injunction. Whose burden is it to show standing? Well, it's the appellees, the plaintiffs, Your Honor. And this is a case where the lion's exception applies here. And I think Judge Hart's hit the nail on the head by saying, you know, perfect adherence to the law is no guarantee. Traffic stops are ubiquitous. It's a fact of life. You could be a passenger in a car that gets pulled over and have no control over that. So appellant's argument that there must be a bright line rule that, you know, if your future injury depends on you committing a traffic violation in the future, you can't, you could never bring a case. You would never have standing for any prospective relief based on a post-stop or post-arrest detention. And lion's doesn't support such a categorical rule. It says if you have an authorized practice, then that creates standing. And courts across the country have found standing under lions under these circumstances, and I would point the court to Maryland State Conference of NAACP versus Maryland State Police, Floyd versus City of New York, and Ortega Melendez versus Arpaio in particular. Were any of those circuit opinions? Ortega Melendez versus Arpaio was affirmed by the Ninth Circuit. Was affirmed by? Correct. Did the deferment specifically address that issue? I believe so, Your Honor. I'd have to go back and look, and I can provide you a citation and a Rule 28J letter if you prefer. Turning to Dr. Momolo's data, in the absence of any other particular data from the KHP, because they did not collect it, the district court found that Dr. Momolo's statistical analysis was the best evidence of a disproportionate practice. And that statistical evidence showed that KHP troopers stopped 70% more out-of-state drivers than would be expected if they were to be arrested for stopping out-of-state and in-state drivers at the same rate. Counsel, do you agree with Mr. Carswell that the state adequately preserved a challenge to those findings of fact? I do not, Your Honor, and I think that's because the district court noted that they provided no contrary evidence or rebuttal evidence to Dr. Momolo's analysis at all. With respect to Mr. Carswell's argument about sampling bias. When you say no rebuttal, if they point out the flaws in it, do they have to have their own study? Can't they just point out that this study is not scientifically based? It's misused data or something like that? I'm not saying they prevail on that, but that's certainly enough to be a challenge, isn't it? It could be enough, Your Honor, but right now that amounts to nothing more than post hoc conjectural attorney argument. Dr. Momolo examined the possibility of sampling bias from that safe graph data, which has been used in other statistical studies, and he concluded that even if there were an implausibly extreme amount of measurement error, the disparities between the stopping of out-of-state drivers compared to in-state drivers, that disparity would still remain in a statistically significant manner. KHB troopers stopping 70% more out-of-state drivers amounts to over 50,000 excess stops in less than three years. And over 90% of canine sniffs were conducted on out-of-state drivers, despite those out-of-state drivers representing only about 35% of the total traffic on the road at those times and places. Counselor, can we talk about the scope of the injunction and, as you know, it has to be narrowly tailored to address the constitutional violations. And as I read through the injunction, there are several that kind of stick out to me, including requiring supervisor approval before a trooper conducts a consent search. These are happening by the side of the road, and so isn't there a concern that that presents a safety risk to the officers who are there, in addition to requiring officers to get, I believe, written consent from drivers and passengers, which the Supreme Court has said has never been required. So if we're looking at the scope of the injunction, how do we assess some of these that may seem a little bit far afield and not be narrowly tailored? Well, I would first say that the appellant had an opportunity below to provide more narrowly tailored provisions, and the district court repeatedly noted in its order that he failed to do so. And it is strong medicine, I agree, Your Honor, but it is necessary for very serious malady. With respect to the written consent forms and the Robinette argument, the injunction is not inconsistent with Robinette. Robinette only speaks to consent searches. It doesn't address roadside detentions. And the district court found that the supervisor approval and the consent form were necessary to help alleviate some of those data collection problems. And since I am just about out of time, in conclusion, I would say that taking appellants to their arguments to logical conclusion no one ever has standing to challenge a traffic stop or subsequent detention under the Fourth Amendment, and federal courts can never enjoin a state law enforcement agency to correct unconstitutional failings, and that simply cannot be. And what we have not heard from appellant today and what is tellingly absent from his briefs is a direct and honest reckoning of how the KHP flouted Vasquez. Appellees urged the court to finish the work it began with Vasquez by affirming the district court's injunction, which is not only necessary, the only truly effective remedy for bringing such an intransigent agency back in line with the Constitution. Thank you. Why wouldn't an easy remedy be to order KHP to change their training practices? That is one part of the injunction, Your Honor. Why do you assume more than that would be necessary? Because that would effectively be just telling them, well, go follow the law. You have to make sure that that's actually happening. The trainings can say one thing, but what happens in practice is an entirely different one. Thank you. Thank you. Thank you. Three quick points. First of all, on the two-step, we do believe these cases are indistinguishable from the two-steps in this court's prior cases. The only attempted distinction I heard was proximity to the vehicle, but that was true in all those cases. That's kind of the nature of the two-step is the trooper only briefly walks away and then turns around and re-approaches the vehicle. So I don't think there's any distinction there. Second is to training. Again, the district court here found that KHP's official training appeared to be consistent with Vasquez. In fact, Vasquez is now included as part of KHP's training. So it was only the practice that the district court found lacking, not the official training. I thought all the officers testified that they, or the ones who testified, testified that they were trained to consider destination and source. Several troopers did testify that that was something they could consider, and the district court said. Not that they could consider, but that they were trained to consider it. Did they not testify to that? Some mentioned training. Of course, training occurs in lots of different ways, but what the district court said is travel to and from a drug source state can be considered as long as it's given very minimal weight. And so it all goes to the amount of weight that it's given. At least that's how the district court read Vasquez, and the district court again said that she believed that KHP's official training was consistent with Vasquez. It was, again, it was just the practice that she had concerns with, but again, based on Momolo's testimony and the traffic stops in this case. Counsel, can we take from your answer then that KHP has a lot of rogue troopers who are not being trained to consider certain things, but say, well, in practice, I'm gonna disregard that. What I've been told in Vasquez, I'm gonna do it anyway? No, that's not what I'm arguing. Although please help me understand then, you're saying, well, Vasquez is trained, and we tell our troopers that you can't consider these factors. But yet all of them get up on the witness stand and testify and say, I consider these factors. What Vasquez said, according to the district court, and I think this is consistent, is that traveling from a drug-sourced state can, at least in some circumstances, be considered as long as it's given very minimal weight. And this court has said that in other occasions, even since Vasquez as well. So it goes to the weight that that's given. It's residency that can't be considered, but there's a distinction between residency and traveling from a drug-sourced state. And again, because reasonable suspicion is such a fact-based inquiry, it depends case by case on what even drug-sourced state means. I mean, I don't think it would be sufficient just to say, well, the state has legalized marijuana, for instance. That doesn't make a state a drug-sourced state. But if there's actually been some showing that drugs are flowing in a large quantity from a particular state, let's say, hypothetically, that 90% of the drugs coming through Kansas are coming from a particular state, I think reasonable suspicion could, that could factor into reasonable suspicion. Again, it's a very fact-based inquiry. You can't really adapt categorical rules about that. And so what the district court said is, I don't find any official policy at odds with Vasquez. It's, again, just their practice based on Momolo's testimony and the stops in this case. And then finally, just briefly, the Ninth Circuit, the case that went up to the Ninth Circuit, Melendrez, which they mentioned, what happened there was the court found that there was a policy of stopping without reasonable suspicion. That's not the case here. Here, KHP does not have a policy of stopping without reasonable suspicion. Thank you. I'd urge you to reverse the district court. Thank you, counsel.